IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM CAREY<br>141 Granite Drive<br>Oxford, PA 19363, | : <br> : <br> : <br> : |
| **Plaintiff** | : CIVIL ACTION<br> : |
| v. | : NO.<br> : |
| NATIONAL EVENT SERVICES, INC.,<br>501 Baily Road<br>Yeadon, PA 19050, | : JURY TRIAL DEMANDED<br> : |
| and | : <br> : |
| PHILADELPHIA EAGLES, LLC,<br>1 Novacare Way<br>Philadelphia, PA 19145-5900, | : <br> : <br> : <br> : |
| **Defendants** | : <br> : |

## AMENDED COMPLAINT

Plaintiff, William Carey ("Mr. Carey" or "Plaintiff"), by and through his attorneys, Arthur D. Goldman, Esq., and Shawn M. Rodgers, Esq., hereby files this complaint against Defendants, National Event Services, Inc. ("NES") and the Philadelphia Eagles, LLC ("Philadelphia Eagles"), and in support thereof, avers as follows:

## PRELIMINARY STATEMENT

1.    In this action, Plaintiff, William Carey, seeks declaratory, injunctive, and equitable relief; compensatory and punitive damages; and costs and attorneys' fees against his former employer, National Event Services, Inc., and against the Philadelphia Eagles, LLC, for

violations of federal and state laws relating to unlawful employment practices, retaliation, intentional interference with business relationships, as well as other related claims.

## JURISDICTION

2.      This action arises under The Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*; The Pennsylvania Whistleblower Law, 43 P.S. §§ 1421, *et seq.*; The Pennsylvania Wage Payment and Collection Law, 43 P.S. §§ 260.1, *et seq.*; and the tort and contract law of this Commonwealth.

3.      Jurisdiction over the federal claims is invoked pursuant to 28 U.S.C. § 1331, 29 U.S.C. §§ 207(a) and 216(b), and over the state law claims pursuant to the doctrine of pendant jurisdiction as codified at 28 U.S.C. § 1367.

4.      Specifically, this Court has jurisdiction over this action because the claims arising under the FLSA, 29 U.S.C. §§ 201 *et seq.*, constitute a federal question pursuant to 28 U.S.C. § 1331.

5.      The state law claims are so related to the claims arising under the FLSA, 29 U.S.C. §§ 201 *et seq.*, that the state law claims form part of the same case or controversy under Article III of the United States Constitution; accordingly, this Court has pendant jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367.

6.      Jurisdiction over the federal claims is also appropriate because Mr. Carey timely filed an internal complaint with Lori Ann Karusky, the Chief Operating Officer for NES (at the time), regarding NES's violation of the overtime payment provisions set forth under 29 U.S.C. § 207(a).

7.     The Pennsylvania Whistleblower Law, 43 P.S. § 1424, requires the injured plaintiff to file a civil action within one-hundred and eighty (180) days of when the alleged violation occurred.

8.     NES terminated Mr. Carey's employment on March 11, 2014 in violation of The Pennsylvania Whistleblower Law, 43 P.S. §§ 1421, et seq., which is within the 180-day time period.

9.     Declaratory, injunctive and equitable relief are sought pursuant to the FLSA, 29 U.S.C. § 216(b) and The Pennsylvania Whistleblower Law, 43 P.S. § 1425.

10.    Compensatory and punitive damages are sought pursuant to the FLSA, the Pennsylvania Whistleblower Law, and under the other pendant state claims; and other damages are sought, including but not limited to lost wages and other lost benefits under the FLSA, The Pennsylvania Whistleblower Law, and the Pennsylvania Wage Payment Act.

11.    Costs and attorneys' fees are sought pursuant to the FLSA, 29 U.S.C. § 216(b); Rule 54 of the Federal Rules of Civil Procedure; the Pennsylvania Whistleblower Law, 43 P.S. § 1425; and Pennsylvania Wage Payment and Collection Law, 43 P.S. §§ 260.1, *et seq*.

## VENUE

12.    This action properly lies in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(b) because the claim arose in this judicial district.

## PARTIES

13.    Plaintiff, William Carey, is an adult male, 36 years of age, who presently resides at 141 Granite Drive, Oxford, Pennsylvania 19363.

14.     Defendant, NES, is a corporation organized, existing, and doing business under and by virtue of the laws of New Hampshire.

15.     Defendant, NES, maintains an office and facility located at 501 Baily Road, Yeadon, Pennsylvania 19050.  Mr. Carey was employed by NES and worked primarily at this business location.

16.     Defendant, NES, is an employer that engages in an industry affecting interstate commerce and employs more than twenty (20) regular employees.

17.     Defendant, Philadelphia Eagles, is a limited liability company organized, exiting, and doing business under and by virtue of the laws of Pennsylvania.

18.     Defendant, Philadelphia Eagles, maintains an office and facility located at 1 Novacare Way, Philadelphia, Pennsylvania 19145-5900.

19.     The Philadelphia Eagles (as well as its subsidiary the Eagles Stadium Operator, LLC) receive public money from the City of Philadelphia, and maintain and operate the Lincoln Financial Field sports complex.

20.     NES currently – and at all pertinent times – contracted with the Philadelphia Eagles (and/or the Eagles Stadium Operator, LLC) to serve as its agent and to provide medical support at Lincoln Financial Field during sporting events.


## FACTS

21.     Mr. Carey was hired by NES in 2007 as a part-time emergency medical technician ("EMT"), earning $10.25 per hour.

22.     At all pertinent times, Carl Monzo ("Mr. Monzo") has been the President of NES; as such, Mr. Monzo is responsible for all policy decisions made by NES.

23.     By continually proving his value to NES, Mr. Carey rapidly advanced to the position of emergency medical services ("EMS") manager, a full-time salaried position, in 2008.

24.     By 2011, Mr. Carey was earning approximately $35,000.00 per year as an EMS manager (plus additional fringe benefits, costs and expenses); in 2012, Mr. Carey's salary increased to $40,000.00 per year.

25.     Mr. Carey's position involved no authority to make discretionary decisions concerning company policies.

26.     As EMS manager, Mr. Carey was responsible for (i) orienting new hires; (ii) creating a schedule for all EMTs employed by NES; (iii) tracking EMT certifications; and (iv) handling employee payroll, as well as client bills and bidding (together with Ms. Elieen Stalford).

27.     Notably, Mr. Carey adapted and implemented E-Core software application (for use with NES event staff scheduling).

28.     Throughout his tenure with NES, Mr. Carey excelled and continually increased his level of responsibility.

29.     Mr. Carey took it upon himself to attempt to repair much of the structural deficiencies left in the wake of the company's previous EMS manager, Jason O'Neil.

30.     Specifically, Mr. Carey undertook the following actions in an attempt to cure the systemic deficiencies at NES (an endeavor that ultimately proved futile and was a contributing factor in Mr. Carey's termination):

        i.     Ordering new drugs and/or pharmaceuticals, to replace the expired products currently in use at the time by NES;

    ii.    Creating employee files and a corresponding employee index (nevertheless, NES currently does not possess copies of each EMT's certification as required by law; thus, despite Mr. Carey's efforts to inform NES of this deficiency, NES remains non-compliant with the law);

    iii.    Notifying NES management that the company was non-compliant with applicable OSHA regulations (for example, no site specific blood-born pathogen training);

    iv.    Making certain that all NES ambulances were properly stocked with the required equipment, drugs, etc. (a deficiency existing prior to Mr. Carey's tenure).

31.    While employed by NES, Mr. Carey frequently worked in excess of forty (40) hours per week.

32.    Specifically, during nights and weekends, Mr. Carey was often required to work various venues (such as Lincoln Financial Field) as an EMS Manager; these hours far exceeded Mr. Carey's normal forty (40) hour workweek.

33.    Despite requiring Mr. Carey to work additional hours, NES refused to compensate Mr. Carey for his time and effort at an increased overtime rate.

34.    Instead of paying Mr. Carey at an increased rate of compensation as mandated by federal and state laws, NES paid Mr. Carey for his additional hours of work at a reduced rate of compensation – a rate that was far below Mr. Carey's normal rate of compensation.

35.    Mr. Carey lodged a complaint with Ms. Lori Ann Karusky, the Chief Operating Officer of NES; however, the company did not change its payment practices.

36.     As noted in the preceding paragraphs, NES contracts with the Philadelphia Eagles (and/or the Eagles Stadium Operator, LLC) to provide medical support during sporting events at Lincoln Financial Field.

37.     During the Philadelphia Eagles playoff game held at Lincoln Financial Field on January 4, 2014, Mr. Carey served as the on-site Emergency Medical Services Manager for NES.

38.     As such, Mr. Carey was responsible for coordinating all medical personnel at Lincoln Financial Field.

39.     NES was not contracted to provide security for this playoff game.

40.     Rather, in addition to its own direct employees, the Philadelphia Eagles contracted with the Philadelphia Police Department, Apex Group, and Contemporary Services Corporation (CSC) to provide security at Lincoln Financial Field on January 4, 2014 (collectively "Eagles Security").

41.     Thus, personnel from the Philadelphia Police Department, Apex Group, CSC, and the Philadelphia Eagles itself were responsible for security during the Eagles playoff game on January 4, 2014 at Lincoln Financial Field.

42.     During the playoff game held at Lincoln Financial Field on January 4, 2014, , in addition to direct security personnel from the Philadelphia Eagles organization itself, the Eagles used personnel from the following groups to provide security for the event: Philadelphia Police Department, Apex Group and CSC (collectively "Eagles Security").

43.     As such, in providing security at playoff game held at Lincoln Financial Field on January 4, 2014, personnel from the Philadelphia Police Department, Apex Group and CSC acted as agents on behalf of the Philadelphia Eagles organization.

44.     Prior to commencement of the game, Eagles Security personnel approached Mr. Carey.  They demanded that Mr. Carey classify all "drunk" patrons as "intoxicated" medical patients and, thus, transport these individuals to an area hospital via ambulance.

45.     Classifying "drunk" patrons as medical patients would relieve Eagles Security from assuming any responsibility for the safety or well-being of these individuals.

46.     This was not simply an attempt by Eagles Security to avoid responsibility, however, but rather a direct violation of the law.

47.     By making this demand of Mr. Carey, Eagles Security insisted that Mr. Carey violate Pennsylvania Department of Health Protocols and – as a result – endanger the safety of the more than 60,000 persons in attendance.

48.     Mr. Carey chose instead to comply with the Pennsylvania Department of Health Protocols and refused to violate the law at the behest of Eagles Security (specifically, personnel from the Philadelphia Police Department, Apex, CSC and the Eagles organization itself).

49.     In response to the unlawful demands made by the Eagles Security, Mr. Carey first explained that he lacked the authority to make such a broad discretionary decision regarding patient care.

50.     The Pennsylvania Department of Health requires all patients to consent voluntarily before they are transported to a hospital via ambulance; as such, in order to consent to transportation, patients must be conscious and able to respond.

51.     Without obtaining prior consent, transporting an individual would violate the law.

52.     If a patron experienced an altered cognitive or mental state, however, then that patron would properly be classified as "intoxicated" and treated accordingly as a medical patient.

Suffering from an altered mental status requires more than mere drunkenness; rather, it requires that the individual be unable to discern the location, the time, and his or her identity.

53.     The Eagles Security demanded a blanket response policy wherein all "drunk" patrons were to be categorized as medical patients – even if not suffering from an altered mental status (in direct contravention with the Pennsylvania Department of Health Protocols).

54.     Next, Mr. Carey directed Eagles Security to speak with Dr. Kenneth G. Lavelle ("Dr. Lavelle"), who was the on-site physician at Lincoln Financial Field on January 4, 2014.

55.     For events with more than 25,000 patrons in attendance, Pennsylvania law requires the presence of an on-site physician.

56.     Dr. Lavelle reinforced Mr. Carey's objections by notifying Eagles Security that he was unwilling to waste the scarce resources available and overload hospitals with "drunk" patrons (who should not properly be classified as medical patients).

57.     Earlier, via emergency alert, the City of Philadelphia informed Dr. Lavelle that there would be a shortage of ambulances and medical resources during the playoff game.

58.     In fact, the only ambulances available at Lincoln Financial Filed on January 4, 2014, were those ambulances supplied by NES.

59.     In the event of actual medical emergencies, wasting ambulances on "drunk" patrons could lead to potentially catastrophic consequences.

60.     Neither Dr. Lavelle nor Mr. Carey would authorize the use of ambulances to transport "drunk" patrons – patrons who properly fell under the purview of Eagles Security.

61.     Dr. Lavelle assured that he and NES staff would perform a thorough evaluation of each patron referred to medical.

62.     If the examination revealed that the patron was simply "drunk" and not properly classified as a medical patient, NES staff would return that patron to the care of Eagles Security.

63.     Once a physician is onsite, the protocols dictate that he or she is the ultimate level of authority and responsible for all decisions regarding patient care.  This includes the decision to transport a patron to the hospital.  Such responsibilities did not fall under Mr. Carey's purview of discretion (at least, in terms of compliance with the well-established laws of this Commonwealth).

64.     These incidents did not take place in a vacuum, without witnesses.  Karin Williams ("Ms. Williams"), the deputy director for the Office of Emergency Management for the Borough of Phoenixville, Pennsylvania, who was acting as an on-site NES supervisor during the playoff game at Lincoln Financial Field on January 4, 2014, witnessed the exchange between Mr. Carey and Eagles Security.

65.     Following the exchange with Mr. Carey, Eagles Security personnel were disgruntled and voiced their displeasure.  Nevertheless, the game went forward without significant incident.

66.     Mr. Carey returned to work after the playoff game on January 4, 2014, performing his normal job functions at his ordinary high level of competence.

67.     Neither the playoff game, nor the spirited exchange with Eagles Security, was mentioned by any person at NES until March 11, 2014.

68.     On March 11, 2014, Mr. Carey and Michael Whisler ("Mr. Whisler") were summoned to the office of Daniel Monzo, the current Chief Operating Officer of NES and the brother of Carl Monzo.

69.     At this meeting, Daniel Monzo informed Mr. Carey that an "incident" had occurred during the Eagles playoff game at Lincoln Financial Field on January 4, 2014.

70.     Specifically, Daniel Monzo described the exchange between Mr. Carey, Dr. Lavelle and Eagles Security as a "debacle."

71.     Daniel Monzo indicated that his brother, NES's President Carl Monzo, had received an email from the front office of the Philadelphia Eagles in February 2014, wherein the Eagles mandated to NES that Mr. Carey was not to return to Lincoln Financial Field for any future events.

72.     According to Carl Monzo, the Eagles (as well as Philadelphia Police) were displeased with Mr. Carey's performance at the playoff game on the January 4, 2014.

73.     In doing so, they were acting specifically in retaliation against Mr. Carey for his refusal to break the law at the Eagles' behest.

74.     The Eagles described Mr. Carey's behavior – specifically his refusal to acquiesce to the demands of Eagles Security – as "uncooperative."

75.     Rather than support Mr. Carey for adhering to the Pennsylvania Department of Health protocols, NES capitulated to the Eagles' demands and provided Mr. Carey with an ultimatum: either resign from the company or be terminated for cause.

76.     Daniel Monzo explained that NES required Mr. Carey's resignation because the organization could not employ an EMS manager who was unable to attend certain events or to enter specific venues – especially events and venues controlled by the Philadelphia Eagles, a major client of NES.

77.     When Mr. Carey refused to resign, Daniel Monzo immediately terminated his employment, which was witnessed by Mr. Whisler.

- 11 -

78.     During this meeting, Daniel Monzo, acting on behalf of NES, explicitly stated that it terminated Mr. Carey's employment for his refusal to acquiesce to the demands of Eagles Security and Philadelphia Police (when they insisted that he violate the law and endanger the welfare of more than 60,000 patrons).

79.     The incident, which occurred on January 4, 2014, exemplifies Mr. Carey's insistence on observing all pertinent laws, regulations and protocols. It was the last in a string of instances where Mr. Carey insisted that NES comply with all applicable laws and standards.

80.     Throughout his tenure with NES, Mr. Carey consistently communicated to Carl Monzo the need for NES to reform and to ensure that all equipment and operating procedures complied with applicable standards.

81.     As Mr. Carey frequently observed, NES often employed operating procedures that blatantly violated the law, such as: (i) inadequate/sub-standard equipment; (ii) mismanagement of pharmaceuticals; (iii) inadequate documentation; and (iv) fraud.

82.     Mr. Carey repeatedly spoke out against the company's pervasive infractions until the day of his termination.

83.     After repeatedly raising these types of concerns to NES management, NES decided to retaliate against Mr. Carey by terminating his employment.

84.     Moreover, at the time of his termination, NES was well aware that he had complained about NES failure to comply with the FLSA by failing to pay him the proper amount of overtime compensation.

85.     In addition, throughout the course of his employment with NES, Mr. Carey has been subject to discrimination and retaliation on the basis of his gender (specifically, as his gender relates to his sexual orientation) and on the basis of a disability affecting his cognitive

skills; Mr. Carey currently is preparing his charge of discrimination regarding any and all related claims before the Equal Employment Opportunity Commission (EEOC).

## COUNT I

### PLAINTIFF v. NATIONAL EVENT SERVICES, INC

#### Violation of The Fair Labor Standards Act (FLSA) – Failure to Pay Overtime 29 U.S.C. §§ 201, *et seq.*

86.  Plaintiff hereby incorporates by reference the averments contained in Paragraphs 1 through 85, as if set forth fully herein.

87.  Mr. Carey complained to the Chief Operating Officer of NES, Lori Ann Karusky, and informed her that, in violation of the FLSA, NES was failing to properly compensate him for the hours he worked in excess of forty (40) hours per week. See 29 U.S.C. § 207(a)(1).

88.  Mr. Carey is not an exempt employee under the FLSA, 29 U.S.C. § 213(a)(1); rather, Mr. Carey falls squarely within the overtime protections established by the FLSA. See 29 C.F.R. § 541.200.

89.  Specifically, when Mr. Carey worked more than forty (40) hours in a single workweek, NES was required to compensate him in excess of the hours above a standard 40-hour workweek "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

90.  While employed by NES, Mr. Carey frequently worked hours in excess of his normal forty (40) hour workweek – often working on-site at venues (such as Lincoln Financial Field) as an EMS manager during nights and weekends.

91.     Despite requiring Mr. Carey to work additional hours, NES refused to compensate Mr. Carey for his time and effort as the FLSA requires.

92.     Instead of paying Mr. Carey at an increased rate of compensation as mandated by federal law, NES paid Mr. Carey for his additional hours of work at a reduced rate of compensation – a rate that was far below Mr. Carey's normal rate of compensation.

93.     Although Mr. Carey lodged his complaint with Ms. Karusky, the Chief Operating Officer of NES, the company did not change its payment practices.

94.     Instead, NES ultimately chose to terminate Mr. Carey's employment.

95.     By the systematic actions of its supervisors and management, which are set forth in the preceding paragraphs of this complaint, NES violated the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.*, by and through its mistreatment of Mr. Carey – specifically, by refusing to compensate Mr. Carey (in accordance with 29 U.S.C. § 207(a)) for the hours that he worked in excess of forty (40) hours per week.

96.     The willful actions of NES and its employees in violating the mandates of the FLSA as it relates to the payment of overtime compensation, and in adversely targeting Mr. Carey, were part of a pattern of unlawful employment practices on the part of NES in violation of the FLSA, 29 U.S.C. §§ 201, *et seq.*

97.     As a direct and proximate result of NES's violation of the FLSA, 29 U.S.C. §§ 201, *et seq.*, Mr. Carey has suffered, and continues to suffer, great harm in the form of, among other things, past and future pecuniary losses, emotional pain and suffering, humiliation, and a loss of life's pleasures.

98.     As a result of the willful and unlawful actions of the NES in violation of the FLSA, 29 U.S.C. §§ 201, *et seq.*, Mr. Carey has been caused to suffer a severe loss of

professional status and reputation in the community of his peers, serious losses of pay, benefits and other employee remunerations, and an underserved and painful diminution of his ability to provide himself and his family with the earned rewards of excellence in his career.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant as follows:

(1)     To enter a declaratory judgment that Defendant's acts, policies, practices and procedures complained of herein have violated and continue to violate the rights of Plaintiff as secured to him by the FLSA;

(2)     To award Plaintiff compensatory damages for, among other things, loss of income, specifically loss of unpaid overtime compensation an amount exceeding $25,000.00, and in an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b);

(3)     To grant Plaintiff liquidated damages as allowed pursuant to the FLSA;

(4)     To grant Plaintiff costs, disbursements and reasonable attorneys' fees as allowed under the FLSA; and

(5)     To grant such other and further relief as this Court deems appropriate.

## COUNT II

### PLAINTIFF v. NATIONAL EVENT SERVICES, INC

#### Violation of the Fair Labor Standards Act (FLSA) – Retaliation
#### 29 U.S.C. §§ 201, *et seq.*

99.     Plaintiff hereby incorporates by reference the averments contained in Paragraphs 1 through 98, as if set forth fully herein.

100. Mr. Carey complained to the Chief Operating Officer of NES, Lori Ann Karusky, and informed her that, in violation of the FLSA, NES was failing to properly compensate him for the hours he worked in excess of forty (40) hours per week. See 29 U.S.C. § 207(a)(1).

101. Although Mr. Carey lodged his complaint with Ms. Karusky, the Chief Operating Officer of NES, the company did not change its payment practices.

102. Instead, NES did not promote Mr. Carey despite his superior performance (rather hiring or promoting less qualified individuals), and ultimately NES chose to terminate Mr. Carey's employment.

103. NES retaliated against Mr. Carey for alerting management of the company's unfair labor practices in violation of 29 U.S.C. §§ 201, et seq.

104. By the systematic actions of its supervisors and management, which are set forth in the preceding paragraphs of this complaint, NES violated the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 et seq., by and through its mistreatment of Mr. Carey.

105. Specifically, because Mr. Carey complained of NES's unlawful employment practices in violation of the FLSA, 29 U.S.C. § 207(a), NES retaliated against Mr. Carey by terminating his employment. See 29 U.S.C. § 215(a)(3).

106. The willful actions of NES and its employees in violating the mandates of the FLSA as it relates to the payment of overtime compensation, and in retaliating against Mr. Carey, were part of a pattern of unlawful employment practices on the part of NES in violation of the FLSA, 29 U.S.C. §§ 201, et seq.

107. As a direct and proximate result of NES's violation of the FLSA, 29 U.S.C. §§ 201, et seq., Mr. Carey has suffered, and continues to suffer, great harm in the form of, among

other things, past and future pecuniary losses, emotional pain and suffering, humiliation, and a loss of life's pleasures.

108.    As a result of the willful and unlawful actions of the NES in violation of the FLSA, 29 U.S.C. §§ 201, *et seq.*, Mr. Carey has been caused to suffer a severe loss of professional status and reputation in the community of his peers, serious losses of pay, benefits and other employee remunerations, and an underserved and painful diminution of his ability to provide himself and his family with the earned rewards of excellence in his career.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant as follows:

(1)    To enter a declaratory judgment that Defendant's acts, policies, practices and procedures complained of herein have violated and continue to violate the rights of Plaintiff as secured to him by the FLSA;

(2)    To require that Defendant return Plaintiff to a comparable position prior to the retaliation in violation of the FLSA, 29 U.S.C. §215(a)(3), and to give Plaintiff full wages and benefits commensurate with that position;

(3)    To award Plaintiff compensatory damages for, among other things, loss of income, specifically loss of unpaid overtime compensation in an amount exceeding $25,000.00, plus in an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b); growth opportunities, the loss of reputation and status in the community of his peers, the loss of his ability to provide himself and his family with the rewards of his years of excellence in his chosen profession, and all benefits denied him due to the improper and unlawful actions of Defendant;

(4)    To grant Plaintiff liquidated damages as allowed pursuant to the FLSA;

(5)     To grant Plaintiff costs, disbursements and reasonable attorneys' fees as allowed under the FLSA; and

(6)     To grant such other and further relief as this Court deems appropriate.

## COUNT III

### PLAINTIFF v. NATIONAL EVENT SERVICES, INC.

### Violation of the Pennsylvania Whistleblower Law – Retaliation
### 43 P.S. §§ 1421, *et seq.*

109.    Plaintiff hereby incorporates by reference the averments contained in Paragraphs 1 through 108, as if set forth fully herein.

110.    As set forth in the preceding paragraphs, NES contracts with the Philadelphia Eagles, LLC (and/or the Eagles Stadium Operator, LLC) to provide medical support during sporting events at Lincoln Financial Field.

111.    During those sporting events for which NES is contracted to provide medical support, NES is an agent of the Philadelphia Eagles (and/or the Eagles Stadium Operator, LLC).

112.    The Philadelphia Eagles (and/or the Eagles Stadium Operator, LLC) are classified as a "public body" under the Pennsylvania Whistleblower Law because the Philadelphia Eagles (and/or the Eagles Stadium Operator, LLC) receive public financing from the City of Philadelphia (and other public entities). See 43 P.S. § 1422 (specifying that a "public body" is any entity "which is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body.")

113.    Importantly, the City of Philadelphia – in part – owns Lincoln Financial Field, the venue at which the Philadelphia Eagles (and/or the Eagles Stadium Operator, LLC) contracts NES to administer medical support for all the 60,000 patrons in attendance.

114.   Thus, on January 4, 2014, NES was contracted by a "public body" (as defined by the Pennsylvania Whistleblower Law) to provide medical support for more than 60,000 patrons at a public facility.

115.   Accordingly, as "an agent of a public body," NES is an appropriate "employer" as defined by the Pennsylvania Whistleblower Law.  See 43 P.S. § 1422.

116.   At all pertinent times – including January 4, 2014 – Mr. Carey was employed by NES.

117.   As set forth in the preceding paragraphs, personnel from the Philadelphia Eagles (and its agents, including officers from the Philadelphia Police Department) demanded that Mr. Carey and NES staff violate the well-established law of this Commonwealth.

118.   Specifically, personnel from the Philadelphia Eagles (and its agents, including officers from the Philadelphia Police Department) insisted that Mr. Carey and NES staff essentially kidnap and temporarily imprison seemingly "intoxicated" patrons without their consent in order to transport those patrons to a hospital via ambulance.

119.   Mr. Carey refused to acquiesce with Eagles Security (which included personnel from CSC, Apex, and the Philadelphia Police Department) and declared that he and NES staff members refused to violate Protocols set forth by the Pennsylvania Department of Health.

120.   If Mr. Carey had simply acquiesced to the demands of Eagles Security personnel (including officers from the Philadelphia Police Department), aside from violating the law of this Commonwealth, those actions would have endangered the welfare of more than 60,000 patrons by needlessly wasting the scarce medical resources available.

121.    Subsequently, on March 11, 2014, Daniel Monzo, the current Chief Operating Officer of NES, summoned to his office Mr. Carey and Michael Whisler ("Mr. Whisler"), who is also employed as an EMS manager by NES.

122.    During this meeting on March 11, 2014, Mr. Carey and Daniel Monzo discussed the events that occurred at Lincoln Financial Field on January 4, 2014.

123.    Mr. Carey explained his actions and his refusal to violate the Pennsylvania Department of Health Protocols, as demanded by the personnel from Eagles Security, CSC, Apex and the Philadelphia Police Department.  See 43 P.S. § 1423(a).

124.    Since the confrontation on January 4, 2014 had occurred, Mr. Carey had intended to make a good faith report to NES management regarding the incident – specifically that Eagles Security personnel demanded that Mr. Carey violate protocols set forth by the Pennsylvania Department of Health.  See 43 P.S. § 1423(a).

125.    Daniel Monzo explained that the Philadelphia Eagles (as well as Philadelphia Police) were displeased with Mr. Carey's performance at the playoff game on the January 4, 2014.

126.    Because the Philadelphia Eagles expressed its displeasure with Mr. Carey's decision to adhere to the Pennsylvania Department of Health Protocols, Daniel Monzo provided Mr. Carey with an ultimatum: either resign from the NES or be terminated for cause.

127.    When Mr. Carey refused to resign, Daniel Monzo immediately terminated his employment.

128.    Daniel Monzo explained that NES required Mr. Carey's resignation because the organization could not employ an EMS manager who was unable to attend certain events or to

enter specific venues – especially events and venues controlled by the Philadelphia Eagles, a major client of NES.

129.    During this meeting, which took place on March 11, 2014, Daniel Monzo specifically stated that NES terminated Mr. Carey's employment for his refusal to acquiesce to the demands of Eagles Security (which included CSC, Apex, and Philadelphia Police) when it insisted that he violate the law and endanger the welfare of more than 60,000 patrons.

130.    Accordingly, NES terminated Mr. Carey's employment explicitly for reporting (and refusing to acquiesce to) "an instance of wrongdoing or waste" in direct violation of the Pennsylvania Whistleblower Law.  See 43 P.S. § 1423(a).

131.    Therefore, NES retaliated against Mr. Carey (a) for his refusal to violate protocols issued by the Pennsylvania Department of Health, and (b) for his longstanding history of voicing concerns about the pervasive nature of NES's disregard for the law.

132.    Mr. Carey was terminated on March 11, 2014, which is within the 180-day time period for filing a civil action arising from a violation of the Pennsylvania Whistleblower Law. See 43 P.S. § 1424(a).

133.    In violation of the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421, et seq., NES retaliated against Mr. Carey (i) for his refusal to violate the well-established law of this Commonwealth and (ii) for his decision to report to NES management his unwillingness to violate the law and to acquiesce to the wrongdoing proposed by Eagles Security (which included Apex, CSC, and Philadelphia Police).

134.    By the systematic actions of its supervisors and management, which are set forth in the preceding paragraphs of this complaint, NES violated the Pennsylvania Whistleblower

Law, 43 P.S. §§ 1421, *et seq.*, by and through the adverse employment actions taken against Mr. Carey.

135.    Specifically, because Mr. Carey refused to violate the well-established law of this Commonwealth (and reported his refusal to NES management), NES wrongfully terminated Mr. Carey's employment in retaliation. See 43 P.S. § 1423(a).

136.    The willful actions of NES and its employees in violating the mandates of the Pennsylvania Whistleblower Law by retaliating against Mr. Carey, are a smaller component of a larger pattern of NES policies and practices that endanger the public welfare; as such, NES's decision to retaliate against Mr. Carey is precisely the type of behavior that the Pennsylvania Whistleblower Law was enacted to curtail.

137.    As a direct and proximate result of NES's violation of the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421, *et seq.*, Mr. Carey has suffered, and continues to suffer, great harm in the form of, among other things, past and future pecuniary losses, emotional pain and suffering, humiliation, and a loss of life's pleasures.

138.    As a result of the willful and unlawful actions of NES in violation of the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421, *et seq.*, Mr. Carey has been caused to suffer a severe loss of professional status and reputation in the community of his peers, serious losses of pay, benefits and other employee remunerations, and an underserved and painful diminution of his ability to provide himself and his family with the earned rewards of excellence in his career.

**WHEREFORE,** Plaintiff demands judgment in his favor and against Defendant as follows:

(1)     To enter a declaratory judgment that Defendant's acts, policies, practices and procedures complained of herein have violated and continue to violate the rights of Plaintiff as secured to him by the Pennsylvania Whistleblower Law;

(2)     To require that Defendant return Plaintiff to a comparable position prior to the retaliation in violation of the FLSA, 29 U.S.C. §215(a)(3), and to give Plaintiff full wages and benefits commensurate with that position;

(3)     To award Plaintiff compensatory damages (pursuant to 43 P.S. § 1425) for, among other things, loss of income and growth opportunities, the loss of reputation and status in the community of his peers, the loss of his ability to provide himself and his family with the rewards of his years of excellence in his chosen profession, and all benefits denied him due to the improper and unlawful actions of Defendant;

(4)     To grant Plaintiff liquidated damages as allowed pursuant to the Pennsylvania Whistleblower Law;

(5)     To grant Plaintiff costs, disbursements and reasonable attorneys' fees as allowed under the Pennsylvania Whistleblower Law; and

(6)     To grant such other and further relief as this Court deems appropriate.


## COUNT IV

### PLAINTIFF v. NATIONAL EVENT SERVICES, INC.

#### Wrongful Termination – Violation of Public Policy

139.    Plaintiff hereby incorporates by reference the averments contained in Paragraphs 1 through 138, as if set forth fully herein.

140.    As set forth in the preceding paragraphs, NES contracts with the Philadelphia Eagles, LLC (and/or the Eagles Stadium Operator, LLC), which is classified as a "public body" under 43 P.S. § 1422, to provide medical support during sporting events at Lincoln Financial Field.

141.    During those sporting events for which NES is contracted to provide medical support, NES is an agent of the Philadelphia Eagles (and/or the Eagles Stadium Operator, LLC).

142.    Importantly, the City of Philadelphia – in part – owns Lincoln Financial Field, the venue at which the Philadelphia Eagles (and/or the Eagles Stadium Operator, LLC) contracts NES to administer medical support for all the 60,000 patrons in attendance.

143.    For the Eagles playoff game held on January 4, 2014, NES was contracted to provide medical support for more than 60,000 patrons at Lincoln Financial Field, a public facility.

144.    Ordinarily, in the Commonwealth of Pennsylvania, no common law cause of action exists against an employer for the termination of an at-will employee; however, a cause of action for the termination of an at-will employee exists if the termination implicates a clear mandate of public policy.

145.    The well-established law of this Commonwealth bars an employer from terminating an at-will employee in three instances: (1) an employer cannot require an employee to a commit a crime; (2) an employer cannot prevent an employee from complying with a statutorily imposed duty; and (3) an employer cannot discharge an employee when expressly prohibited from doing so by statute.

146.    As set forth in the preceding paragraphs, personnel from the Philadelphia Eagles (and its agents, including officers from the Philadelphia Police Department) demanded that Mr. Carey and NES staff violate the well-established law of this Commonwealth.

147.    Specifically, personnel from the Philadelphia Eagles (and its agents, including officers from the Philadelphia Police Department) insisted that Mr. Carey and NES staff essentially kidnap and temporarily imprison seemingly "intoxicated" patrons without their consent in order to transport those patrons to a hospital via ambulance.

148.    Mr. Carey refused to acquiesce with Eagles Security (which included personnel from CSC, Apex, and the Philadelphia Police Department) and declared that he and NES staff members refused to violate Protocols set forth by the Pennsylvania Department of Health.

149.    If Mr. Carey had simply acquiesced to the demands of Eagles Security personnel (including officers from the Philadelphia Police Department), aside from violating the law of this Commonwealth, those actions would have endangered the welfare of more than 60,000 patrons by needlessly wasting the scarce medical resources available.

150.    On March 11, 2014, during a meeting with Daniel Monzo (the current Chief Operating Officer of NES), Mr. Carey explained his actions and his refusal to violate the Pennsylvania Department of Health Protocols, as demanded by the personnel from Eagles Security, CSC, Apex and the Philadelphia Police Department.

151.    Because the Philadelphia Eagles expressed its displeasure with Mr. Carey's decision to adhere to the Pennsylvania Department of Health Protocols, Daniel Monzo provided Mr. Carey with an ultimatum: either resign from the NES or be terminated for cause.

152.    When Mr. Carey refused to resign, Daniel Monzo immediately terminated his employment.

153.   Daniel Monzo explained that NES required Mr. Carey's resignation because the organization could not employ an EMS manager who was unable to attend certain events or to enter specific venues – especially events and venues controlled by the Philadelphia Eagles, a major client of NES.

154.   During this meeting, which took place on March 11, 2014, Daniel Monzo specifically stated that NES terminated Mr. Carey's employment for his refusal to acquiesce to the demands of Eagles Security (as well as CSC, Apex, and Philadelphia Police) when it insisted that he violate the law and endanger the welfare of more than 60,000 patrons.

155.   Accordingly, NES terminated Mr. Carey's employment because Mr. Carey refused to violate the well-established law of this Commonwealth, specific protocols set forth by the Pennsylvania Department of Health.

156.   Under Pennsylvania law, NES required Mr. Carey – as part of the terms of his employment – to violate an explicit statement of public health policy as delineated directly by the Pennsylvania Department of Health.

157.   Because NES terminated Mr. Carey's employment for his refusal to violate Pennsylvania law, the public policy exception applies to the situation described in the preceding paragraphs and gives rise to a cause of action for wrongful termination.

158.   The Pennsylvania Department of Health protocols are an expression of public policy that are so obviously in support of public health, safety, morals, and welfare that there is a virtual unanimity of opinion in regard to the protocols.

159.   NES violated the well-established public policies embodied by the Pennsylvania Department of Health protocols when it terminated Mr. Carey's employment.

160.   The willful actions of NES and its employees in violating the public policy set forth by the Pennsylvania Department of Health protocols are a smaller component of a larger pattern of NES policies and practices that endanger the public welfare; as such, NES's decision to terminate Mr. Carey's employment is precisely the type of behavior that the public policy exception is designed to curtail.

161.   As a direct and proximate result of NES's violation of the public policy set forth by the Pennsylvania Department of Health protocols and its decision to terminate Mr. Carey for adhering to these protocols, Mr. Carey has suffered, and continues to suffer, great harm in the form of, among other things, past and future pecuniary losses, emotional pain and suffering, humiliation, and a loss of life's pleasures.

162.   As a result of the willful and unlawful actions of NES in violation of the public policy set forth by the Pennsylvania Department of Health protocols and its decision to terminate Mr. Carey for adhering to these protocols, Mr. Carey has been caused to suffer a severe loss of professional status and reputation in the community of his peers, serious losses of pay, benefits and other employee remunerations, and an underserved and painful diminution of his ability to provide himself and his family with the earned rewards of excellence in his career.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant as follows:

(1)   To enter a declaratory judgment that Defendant's acts, policies, practices and procedures complained of herein have violated and continue to violate the public policy set forth by the Pennsylvania Department of Health protocols, as well as the rights of Plaintiff as a citizen of this Commonwealth;

(2)     To require that Defendant return Plaintiff to a comparable position prior to the wrongful termination in violation of the public policy set forth by the Pennsylvania Department of Health protocols, and to give Plaintiff full wages and benefits commensurate with that position;

(3)     To award Plaintiff compensatory damages for, among other things, loss of income and growth opportunities, the loss of reputation and status in the community of his peers, the loss of his ability to provide himself and his family with the rewards of his years of excellence in his chosen profession, and all benefits denied him due to the improper and unlawful actions of Defendant;

(4)     To grant Plaintiff liquidated damages as allowed pursuant to the law of this Commonwealth;

(5)     To grant Plaintiff costs, disbursements and reasonable attorneys' fees as allowed under the law of this Commonwealth; and

(6)     To grant such other and further relief as this Court deems appropriate.

## COUNT V

### PLAINTIFF v. NATIONAL EVENT SERVICES, INC

#### Violation of the Pennsylvania Wage
#### Payment & Collection Law, 43 P.S. §§ 260.1, *et seq.*

163.     Plaintiff hereby incorporates by reference the averments contained in Paragraphs 1 through 162, as if set forth fully herein

164.   At the time NES terminated Mr. Carey's employment, and at all times relevant hereto pursuant to the laws of this Commonwealth, he was entitled to receive overtime pay for the hours worked in excess of forty (40) hours per week since 2008.

165.   Specifically, NES failed and refused to pay Mr. Carey the overtime to which he would otherwise have been entitled under the laws of this Commonwealth, an amount in excess of $25,000.00.

166.   Based on the information in Mr. Carey's possession, the total amount due Mr. Carey in earned, unpaid wages exceeds $25,000.00.

167.   NES has refused to compensate Mr. Carey for his earned wages despite repeated requests by Mr. Carey and his counsel for payment.

168.   Notably, prior to his termination, Mr. Carey notified Lori Ann Karusky, the Chief Operating Officer for NES (at the time), regarding the failure to pay the overtime wages due; however, Ms. Karusky made clear that NES would not agree to pay the wages owed in accordance with the laws of this Commonwealth.

169.   Pursuant to 43 P.S. § 260.9a(f), Mr. Carey is entitled to all reasonable attorneys' fees and costs he incurs for collection of any and all unpaid wages.

170.   NES, in bad faith and in wanton disregard to Mr. Carey's right to receive compensation, has refused to pay Mr. Carey's his earned wages.

171.   Pursuant to 43 P.S. § 260.10, Mr. Carey is permitted liquidated damages equal to twenty-five percent (25%) of the total amount of wages due.

172.   NES's unjustifiable refusal to compensate Mr. Carey amounts to a willful, wanton, and/or reckless indifference to NES's obligation to pay Mr. Carey, which warrants the award of punitive damages.

**WHEREFORE**, Plaintiff demands the entry of judgment in his favor and against Defendant, in an amount in excess of $25,000.00, plus all reasonable attorneys' fees incurred by Plaintiff, punitive damages, liquidated damages, interest, costs, and any and all additional relief as may be deemed appropriate by the Court.

## COUNT VI

## PLAINTIFF v. PHILADELPHIA EAGLES, LLC

### Tortious Interference With Existing Employment Relationship -- Violation of Public Policy

173.    Plaintiff hereby incorporates by reference the averments contained in Paragraphs 1 through 172, as if set forth fully herein.

174.    As set forth in the preceding paragraphs, NES contracts with the Philadelphia Eagles, LLC (and/or the Eagles Stadium Operator, LLC), which is classified as a "public body" under 43 P.S. § 1422, to provide medical support during sporting events at Lincoln Financial Field.

175.    Importantly, the City of Philadelphia – in part – owns Lincoln Financial Field, the venue at which the Philadelphia Eagles (and/or the Eagles Stadium Operator, LLC) contracts NES to administer medical support for all the 60,000 patrons in attendance.

176.    For the Eagles playoff game held on January 4, 2014, NES was contracted to provide medical support for more than 60,000 patrons at Lincoln Financial Field, a public facility.

177.    At all pertinent times – including January 4, 2014 – Mr. Carey was employed by NES as an at-will employee.

178.    The Pennsylvania Supreme Court has adopted Section 766 of the Restatement (Second) of Torts, which addresses contracts terminable at-will.  See Restatement (Second) of Torts § 766.

179.    Comment g of Section 766 of the Restatement (Second) of Torts specifies that a contract, which may be terminated at-will, "is valid and subsisting, and [a third party] defendant may not properly interfere with it" until the contract has been – in fact – terminated. Restatement (Second) of Torts § 766, Comment g.

180.    The Restatement further specifies that "[o]ne's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them.  For this reason, an interference with this interest is closely analogous to interference with prospective contractual relations."  Restatement (Second) of Torts § 766, Comment g.

181.    The Philadelphia Eagles improperly and intentionally interfered with Mr. Carey's employment relationship at NES.

182.    Specifically, the Philadelphia Eagles induced or otherwise caused NES to terminate Mr. Carey's employment – an action that NES would not have undertaken but for the Philadelphia Eagles influence.

183.    By intentionally interfering with Mr. Carey's employment relationship with NES and inducing NES to terminate that relationship, the Philadelphia Eagles acted in a manner that was willful, malicious, wanton, reckless, and oppressive.

184.    The Philadelphia Eagles acted with the express intent to harm Mr. Carey by interfering with his employment relationship.

185.    The Philadelphia Eagles acted without any privilege or justification to interfere with Mr. Carey's employment relationship; rather, the Philadelphia Eagles violated the express

public policy set forth by the Pennsylvania Department of Health and sought to endanger the lives of approximately 60,000 patrons in attendance at Lincoln Financial Field on January 4, 2014.

186.     As set forth in the preceding paragraphs, personnel from the Philadelphia Eagles (and its agents, including officers from the Philadelphia Police Department) demanded that Mr. Carey and NES staff violate the well-established law of this Commonwealth.

187.     Specifically, personnel from the Philadelphia Eagles (and its agents, including officers from the Philadelphia Police Department) insisted that Mr. Carey and NES staff essentially kidnap and temporarily imprison seemingly "intoxicated" patrons without their consent in order to transport those patrons to a hospital via ambulance.

188.     Mr. Carey refused to acquiesce with the demands of Eagles Security (which included personnel from CSC, Apex, and the Philadelphia Police Department) and violate Protocols set forth by the Pennsylvania Department of Health.

189.     Violating protocols issued by the Pennsylvania Department of Health would have endangered the welfare of more than 60,000 patrons by needlessly wasting the scarce medical resources available.

190.     On March 11, 2014, based upon the Philadelphia Eagles' displeasure with Mr. Carey's performance during the playoff game in January, Daniel Monzo (the current Chief Operating Officer of NES) terminated Mr. Carey's employment.

191.     Daniel Monzo indicated that his brother, Carl Monzo (President of NES), had received an email from the front office of the Philadelphia Eagles in February 2014, wherein the Eagles mandated to NES that Mr. Carey was not to return to Lincoln Financial Field for any future events.

192.    The Philadelphia Eagles described Mr. Carey's behavior – specifically his refusal to acquiesce to the demands of Eagles Security – as "uncooperative."

193.    Because the Philadelphia Eagles were displeased with Mr. Carey's decision to adhere to the Pennsylvania Department of Health Protocols, Daniel Monzo provided Mr. Carey with an ultimatum: either resign from the NES or be terminated for cause.

194.    When Mr. Carey refused to resign, Daniel Monzo immediately terminated his employment.

195.    Daniel Monzo explained that NES required Mr. Carey's resignation because the organization could not employ an EMS manager who was unable to attend certain events or to enter specific venues – especially events and venues controlled by the Philadelphia Eagles, a major client of NES.

196.    During this meeting, which took place on March 11, 2014, Daniel Monzo specifically stated that NES terminated Mr. Carey's employment for his refusal to acquiesce to the demands of Eagles Security (as well as CSC, Apex, and Philadelphia Police) when it insisted that he violate the law and endanger the welfare of more than 60,000 patrons.

197.    Accordingly, the Philadelphia Eagles induced NES to terminate Mr. Carey's employment because of his refusal to violate Pennsylvania law, an explicit statement of public health policy as delineated directly by the Pennsylvania Department of Health.

198.    As a direct and proximate result of the Philadelphia Eagles' intentional interference with Mr. Carey's employment relationship at NES, Mr. Carey has suffered, and continues to suffer, great harm in the form of, among other things, past and future pecuniary losses, emotional pain and suffering, humiliation, and a loss of life's pleasures.

199.    As a result of the willful and unlawful actions of the Philadelphia Eagles in violation of Pennsylvania law (and, specifically, the public policy set forth by the Pennsylvania Department of Health protocols), Mr. Carey has been terminated and caused to suffer a severe loss of professional status and reputation in the community of his peers, serious losses of pay, benefits and other employee remunerations, and an underserved and painful diminution of his ability to provide himself and his family with the earned rewards of excellence in his career.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant as follows:

(1)    To enter a declaratory judgment that Defendant's acts, policies, practices and procedures complained of herein have violated and continue to violate the public policy set forth by the Pennsylvania Department of Health protocols, as well as the rights of Plaintiff as a citizen of this Commonwealth;

(2)    To award Plaintiff compensatory damages for, among other things, loss of income and growth opportunities, the loss of reputation and status in the community of his peers, the loss of his ability to provide himself and his family with the rewards of his years of excellence in his chosen profession, and all benefits denied him due to the improper and unlawful actions of Defendant;

(3)    To grant Plaintiff liquidated damages as allowed pursuant to the law of this Commonwealth;

(4)    To grant Plaintiff costs, disbursements and reasonable attorneys' fees as allowed under the law of this Commonwealth; and

(5)    To grant such other and further relief as this Court deems appropriate.

## JURY DEMAND

Mr. Carey demands trial by jury on all claims and issues triable by a jury.

Respectfully submitted,

Arthur D. Goldman, Esquire
Attorney I.D. 56983
P.O. Box 115
Paoli, PA 19301
Tel: (484) 343-2856
Email: agoldman@arthurgoldmanlaw.com

Shawn M. Rodgers, Esquire
Attorney I.D. 307598
P.O. Box 552
Paoli, PA 19301
Tel: (484) 888-8054
Email: shawn.michael.rodgers@gmail.com

Attorneys for Plaintiff
William Carey